IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| **BRENDA F. CAMPBELL**, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08-4217-CV-C-NKL |
| | ) | |
| v. | ) | Judge Nanette K. Laughrey |
| | ) | |
| **EXPERIAN INFORMATION SOLUTIONS, INC.**, | ) ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO EXPERIAN'S
MOTION IN LIMINE #1 TO EXCLUDE TESTIMONY OF
DR. STAN SMITH**

## I. INTRODUCTION.

Contrary to Experian's scathing attack on Plaintiff's damage expert, Stan V. Smith, PhD, Dr. Smith is not being offered to come perform voodoo on the jury. Having an expert assist the jury in understanding the economic value of one's enjoyment of life so as to ultimately place a dollar figure on Plaintiff's damages in this instance (assuming the jury desires to do so), is not some newfangled idea. Experian neither challenges the recoverability of loss of enjoyment of life damages not Dr. Smith's qualification as an expert.

However, as might be expected from a defendant that is increasingly panicked by the reality that its callous and unreasonable conduct will soon be judged, Experian is desperate to strike evidence that would assist the jury in determining how to assess damages for that wrongful conduct. Experian attempts to discredit Dr. Smith by arguing that his testimony is "routinely rejected" and citing a handful of economic consultants as opposing Dr. Smith's methodology. *See* Experian's Motion in Limine #1 at 3, 15. But this is only part – a very slanted part – of Dr. Smith's history.

Nineteen (19) federal courts and over one hundred (100) state courts have specifically allowed Dr. Smith's testimony on loss of enjoyment of life damages.[1] Numerous renowned economists support Dr. Smith's methodology, and several universities utilize Dr. Smith's textbook in their curriculum.[2] The federal government has adopted the same methodology for the regulatory agencies.[3] While an expert does not require universal acceptance to warrant qualification, Dr. Smith's methodology for calculation of loss of enjoyment of life damages is both reliable and widely accepted in the field of economics.

Finally, and perhaps most germane to the instant inquiry, Dr. Smith's testimony will aid the trier of fact by providing helpful information about the relevant economic considerations that may go into the juries ultimate conclusion regarding damages, something with which the average lay person is simply not familiar.

## II.     DR. SMITH'S TESTIMONY IS ADMISSIBLE UNDER FRE 702 AND DAUBERT.

### A.     Dr. Smith Has Specialized Knowledge Skill, Experience, Training, And Education In The Field Of Economics And Hedonic Damages.

Experian has not and cannot dispute that Dr. Smith is a nationally recognized forensic economist who co-authored *the* textbook on "Economic/Hedonic Damages."[4] His expert testimony on the value of life has been admitted into evidence at trial and/or has survived a motion in limine well over one hundred (100) times nationwide. Dr. Smith is also the author of many economic articles that have appeared in economic peer review journals and law journals. He has served as an adjunct Professor at DePaul University College of law. He received his Master's

---

[1] A list of case cites admitting Dr. Smith's testimony as well as select orders from various federal district courts on point are attached hereto as Exhibit A.

[2] Over the years, other renowned economists have volunteered sworn statements touting Dr. Smith's methodology for calculating loss of enjoyment of life damages. A sampling of these sworn statements as well as various letter from universities regarding the use of Dr. Smith's textbook are attached hereto as Exhibit B.

[3] *See* Federal Regulations, reports and studies attached hereto as Exhibit C.

[4] *See* Dr. Smith's Curriculum Vitae which is attached hereto as Exhibit D.

2

degree and Ph.D. in Economics from University of Chicago. In addition, he has had extensive experience in advising institutional investors regarding economics and finance.

### B. Dr. Smith's Testimony Is Based On Reliable Economic Methods.

An award of loss of enjoyment of life damages, *i.e.*, hedonic damages, requires the jury to make an economic decision. As with every economic decision, it cannot be based on perfect knowledge but on the best evidence available. Dr. Smith will provide the jury the economic evidence generated by 40 years of studies and analysis relevant to that decision. This literature has been published in economic journals of the highest renown by authors of the highest economic credentials determining that the statistical average life is within the 5 million dollar range.[5] These results are near universally accepted as valid within the forensic economic field.[6] Also, in analyzing the potential impact to life or limb this is the only methodology used by every federal regulatory agency.[7] The agencies regularly report to Congress using this methodology. There is simply no other alternative methodology.

Dr. Smith will not tell the jury what amount to award Plaintiff or even that they should award her anything. Rather, Dr. Smith will take the results of forty (40) years of literature, along with Plaintiff's own testimony as to her loss of enjoyment of life, and explain to the jury how to use the methodology as a tool to aid in reaching a conclusion regarding the amount of damages that *could* be awarded from an economic perspective.

### C. Dr. Smith's Testimony is Based Upon Reliable Scientific Methods.

Dr. Smith's hedonic damage calculations employ the "risk reduction" or "willingness-to-pay" methodology. Historically, economists traditionally valued life under what

---

[5] *See* Expert Report attached hereto as Exhibit E.
[6] *See* Deposition of Stan Smith at 146:3.
[7] *See* Exhibit C, *supra*.

3

was known as the "human capital" ("HC") concept, which determined that the monetary value of a person's life is determined by the person's ability to earn money in the labor market. *See* Adam Smith, *The Wealth of Nations,* pp. 38-39 (E. Canaan Ed. 1937)(First Ed. 1776). *See also* Ted R. Miller, *Willingness to Pay Comes of Age*; *Will the System Survive?* Northwestern University Law Review Vol. 83, No. 4 1989). The historical HC approach to valuing lives has been widely criticized, especially over the last twenty years, because it places no value on lost *quality* of life, or pain and suffering. Additionally, the HC approach places a minimal or no value on the lives of retired persons, persons in nursing homes, and children, as these individuals' labor market production has either ended or has yet to begin.

In recent years, economists have approached valuation of human life not based on lost capital but on the amount that a person is willing to pay for a reduced probability of dying by examining markets for risk reduction. *See* Miller, *Willingness to Pay*, Northwestern University Law Review, *supra*. This "risk reduction value" also known as "willingness-to-pay" has become widely accepted among economists; in fact, having gained general acceptance in economics, this is presently considered the "conventional methodology" for establishing the value of human life. *See* Miller, *Willingness to Pay*, in Cost of Injury in the United State; a Report to Congress, pp. 101-09(1989); Fisher, Chestnut & Violette, *The Value of Reducing Risks of Death: A note On New Evidence,* 8 J. Pol'y Analysis & Mgmt. 87 (1989).

The "risk reduction value" primarily examines the amount of money people are willing to pay in order to reduce the chance of fatal injury or illness. Economists like Dr. Smith estimate these values based upon factors including: the extra wages employers pay to induce people to take risky jobs; the demand and price for products that enhance health and safety; and empirical surveys that ask people about their willingness to invest money to enhance their health or safety. *See* Miller, *Willingness to Pay*, Report to Congress, *supra*. These risk reduction values

4

are further based upon various economic studies that have been performed by government, private industry and academics and are obtained from a variety of statistically reliable sources to arrive at a value range for a statistically typical human life. This statistically average value range of life is then adjusted by the particular circumstances of the individual Plaintiff, and adjusted for life expectancy, degree of impairment, and other factors.

The risk reduction valuation methodology, therefore, incorporates both objective statistical information gathered from a variety of reliable sources, including the United States government, industry, and academic data calculations, and is then subjectively modified based on the particular facts and circumstances of the individual Plaintiff to arrive at a value range of damages that would compensate the Plaintiff for his loss of enjoyment of life.

### D. Peer Review of Dr. Smith's Methodology Has Been Extensive.

Dr. Smith's "willingness-to-pay" methodology has been the subject of extraordinarily extensive peer review. Economists have published over 100 peer-reviewed studies in peer-reviewed literature estimating the value of life. *See*, *e.g.*, W.K. Viscusi, *Journal of Economic Literature*, Vol. 31, Dec. 1993, 1912-46; T.R. Miller, *Journal of Forensic Economics,* Vol. 3, No. 3, Fall 1990, 17-39 (discussing the dozens of articles published in peer-reviewed economic journals on this topic). The fact remains that this methodology has been discussed and studied by well-respected economists for decades.

### E. Dr. Smith's Methodology Has Received General Acceptance In The Field Of Economics.

Dr. Smith's methodology is and has been generally accepted in the field of economics for many years. In fact, as stated by the prestigious and highly regarded "The Rand Corporation" in 1988, "[m]ost economists would agree that the willingness-to-pay methodology is the most conceptually appropriate criterion for establishing the value of life." King and Smith,

5

*Computing Economic Loss in Cases of Wrongful Death*, the Rand Institute for Civil Justice, R-3549-ICJ, 1988.

Economics courses at the undergraduate and graduate level throughout hundreds of colleges and universities nationwide teach this methodology and it is discussed in widely-accepted textbooks such as *Economics,* Sixth Ed., David Colander, McGraw-Hill Irwin, 2006, which is the third most widely used textbook in college courses nationwide. *See* Hammerers and Rees, *The Economics of Work and Pay*, Harper-Collins, 1993. Judge Richard A. Posner, former Chief Justice of the U.S. Court of Appeals for the Seventh Circuit and Senior Lecturer at the University of Chicago Law School, details the value of life approach in his widely used textbooks, *Economic Analysis of Law,* 1986, Little Brown & Co. 182-185 and *Tort Law*, 1982, Little Brown $ Co., 120-126.

General acceptance is also demonstrated by publications in the peer-reviewed *Journal of Forensic Economics*, which is the primary journal in the field of forensic economics. This journal has published numerous articles dealing with this methodology with respect to the value of life. *See, e.g.* W.K. Viscusi, *The Econometric Basis for Estimates of the Value of Life*, Journal of Forensic Economics, Vol. 3, No 3, Fall 1990, 61-70; S.V. Smith, *Hedonic Damages in the Courtroom Setting*, Journal of Forensic Economics, Vol. 3. No. 3, Fall 1990; G.R. Albrecht, *Hedonic Damages and Personal Injury: A Conceptual Approach,"* Vol. 5. No.2, Spring/Summer 1992. *See also* Exhibit B attached hereto.

Standing alone, the broad acceptance and use of the value-of-life calculations used by Dr. Smith establishes the admissibility of his proffered testimony.

### F. Numerous Courts Have Allowed Dr. Smith's Testimony And/Or The Willingness-To-Pay Methodology.

While Experian's brief cites cases from various jurisdictions in which Dr. Smith's

testimony and/or the willingness-to-pay methodology has been criticized and disallowed, there is no mention of the reality that Dr. Smith has qualified to testify and, in fact, has testified at trial in over one hundred (100) cases over the course of more than twenty (20) years.[8] In one of the early cases where Dr. Smith's qualifications were challenged, the Seventh Circuit Court of Appeals offered these words:

> The testimony of expert economist Stanley Smith was ***invaluable*** to the jury in enabling it to perform its function of determining the most accurate and probable estimate of the damages recoverable for the hedonic value of [plaintiff's] life"

*See Sherrod v. Berry*, 827 F.2d 195, 206 (7th Cir. 1987).

### G. Conflicting Views Regarding Dr. Smith's Methodology Are Minimal And Not-Credible.

Despite the overwhelming evidence proving that Dr. Smith is one of the foremost experts in his field and that his methodology has been scrutinized and generally accepted by his peers, Experian seeks to exclude his testimony based on a small handful of economists and wrongly decided cases.

For instance, Experian relies heavily on some of the articles published by W.K. Viscusi. But Viscusi himself has endorsed this methodology on behalf of Plaintiffs in more than ten (10) cases. In fact, Viscusi specifically endorsed Dr. Smith's numbers for use in the litigation context.[9] This illustrates that even the main opponent of Dr. Smith's methodology actually approves of and has used the same methodology.

Even if Viscusi is now critical of the methodology, there is no need for unanimity among experts' opinions. If disagreement among experts was the standard for barring testimony, experts would rarely, if ever, qualify to testify. It is routinely and properly left to the jury to

---

[8] *See* Exhibit A
[9] *See* Affidavit and Deposition Testimony of W.K. Viscusi attached hereto as Exhibit F.

7

Case 2:08-cv-04217-NKL   Document 186   Filed 12/01/09   Page 7 of 13

determine whether to believe an expert and the weight to be given to the testimony. The conflicts among economists relating to hedonic calculations are of the same type and degree as the conflicts among economists regarding discount rate or work life expectancies.[10]

Experian also places considerable weight on an opinion in *Ayers v. Robinson* 887 F.Supp. 1049 (N.D. Ill. 1995), which criticized Dr. Smith's methodology and excluded his testimony. There are numerous oddities in this opinion which calls its rationale into question.

First, while the *Ayers* court paid lip service to the decision in *Sherrod*, *supra*, where the Seventh Circuit stated Dr. Smith's testimony is "*invaluable* to the jury in enabling it to perform its function of determining the most accurate and probable estimate of the damages recoverable for the hedonic value of [plaintiff's] life (emphasis added)," the court never again mentions the Seventh Circuit's holding Dr. Smith's testimony in such high regard. There is no explanation or any discussion of the court's drastic departure from the *Sherrod* opinion. *See Ayers*, *supra*, 887 F.Supp. at 1059.

Second, the *Ayers* court specifically acknowledged that multiple government regulations and agencies rely upon Dr. Smith's willingness-to-pay methodology but then flatly rejected these facts stating that government regulations are the result of a "bureaucratic and political process," and that government agencies "abandon science to secure politically acceptable compromises." *See Ayers*, *supra*, 887 F.Supp. at 1061.

The fact of the matter is that multiple federal agencies rely upon the willingness-to-pay methodology and the "statistical life value" concept for valuing mortality risk reductions for governmental regulations.[11] Thus, Dr. Stan Smith's testimony which is dismissed by Experian and by the *Ayers* court as "junk science" is relied upon by the United States government in making

---

[10] See Exhibit B, Ward Aff. at ¶ 11, Skurski Aff. at ¶ 8, and Albrecht Aff. at ¶ 4.
[11] *See* Exhibit C.

8

policy determinations and regulations. Simply because governmental regulations somewhat involve and result from "bureaucratic and political processes," the willingness-to-pay methodology is nevertheless a significant tool utilized and relied upon in policy making by the United States government.

Third, the *Ayers* decision applies a strict, formulistic approach to evaluating the willingness-to-pay methodology. Several courts have noted that while the general framework of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), applies to all expert testimony, courts should apply the *Daubert* factors with a clear understanding that they were devised specifically for "scientific" testimony, and that the *Daubert* analysis should be modified in the case of social science or other non-scientific expertise. *See*, *e.g.*, *State of Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.*, 925 F.Supp. 1247, 1252 (S.D. Ohio 1996); *In re: Aluminum Phosphide Antitrust Litigation*, 893 F.Supp. 1497 (D. Kan. 1995); *General Electric Co. v. Joiner*, 522 U.S. 136 (1997) (noting that the Federal Rules of Evidence allow district courts to admit a broader range of scientific testimony than would have been admissible under *Frye v. US 54 Ap. D.C. 46 (CA D.C. 1923)*).

### H.  Experian's Criticism of Plaintiff's Self Assessment Is Without Merit.

Experian criticizes the use of the self assessment by Plaintiff as biased, and argues that the lack of any mental health professional assessment in determination of Plaintiff's percentage of loss in this instance is fatal. But it is well established that a plaintiff may offer her own testimony as to the damages she suffered. *Carey v. Piphus*, 435 U.S. 247, 264 (1978) ("We use the term "distress" to include mental suffering or emotional anguish. Although essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others."). It is up to the jury to assess what they believe with respect to the impact this ordeal has had on Plaintiff's quality of life.

9

In this regard, Experian will have every opportunity to point out any alleged bias in Plaintiff's assessment on cross examination. As noted by the United States Supreme Court, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional means of attacking shaky but admissible evidence." *Daubert*, *supra*, 509 U.S. at 596.

### III.  DR. SMITH'S TESTIMONY IS ESSENTIAL TO ACHIEVING CONSISTENT RATIONALE AWARDS.

Experian argues that Dr. Smith's testimony will not be helpful to the jury since the jury can determine for itself the value of life without experts. But, absent expert testimony, jurors would be being asked to quantify intangible damages without any basis or framework in which to do so. Without the assistance of Dr. Smith's testimony the jury will be forced merely to speculate as to an amount. Ironically, the case of *Smith v. Ingersoll*, 214 F.3d 1235(10th Cir, 2000), cited by Experian for excluding Dr. Smith, illustrates the danger in not providing the jury with this tool to aid in their calculations. In *Smith,* Dr. Smith was actually permitted to testify regarding hedonic damages but was not permitted to provide his range of calculations. As a result, the Jury awarded over twenty million in damages for a highway worker who had lost his leg.

The value of Dr. Smith's testimony in this regard was described by one court as follows:

> And I think what this – what Dr. Smith does, and there's no question that he certainly has the credentials as an economist, he has a theory that is – has some level of endorsement from no less than a Nobel Prize winning economist. And it certainly is discussed in literature, including peer review literature, and it seems to be accepted. But as I understand it, at least at this point, and I don't profess to be an expert in any way, what Dr. Smith seems to be saying is that his methodology is a methodology of coming up with a measurement of what our society in economic sense places on some of these things, and it's a range.
>
> And I am prepared to, and am, revisiting my earlier view, and I think this indeed might be helpful to – it would seem to be helpful to a jury. As Judge Kolenda says, we tell the jury there isn't any formula or precise way to compute

10

noneconomic damages. But that, of course, noneconomic losses can be real and that therefore, the law permits compensation for them. And we tell the jury there are certain rules, however, that govern their computation of damages. One of the things we tell them is there computation cannot be speculative but must be based on the evidence presented at the trial. And Judge Kolenda goes on, every time I have gone to that passage in the Standard Jury Instructions, it has occurred to me that what I am in fact doing is telling the jury that they may not speculate, which, of course, is true, but that I'm telling them to go ahead and speculate because, of course, we don't have anything of record that really helps them decide.

*Grant, et al. v. Sears Roebuck & Co., et al.*, unreported, Case No. 01-10300-NI, in the Circuit Court for the County of Manistee, Michigan (2001). As stated in *Sherrod*, *supra*, Dr. Smith's testimony is "invaluable" to aid the jury in this complicated determination.

## IV.     CONCLUSION.

Valuing human life is unquestionably an extremely difficult task. The more difficult something is to evaluate, the greater the need for expert testimony to assist the jury in making its determination.

Expert economic testimony is routinely admitted in cases concerning the evaluation of businesses, real estate, personal property, etc. Oddly, the average juror likely has much more experience in evaluating real property and business concerns than human life. Yet it is routine to assist the jury with expert testimony in those instances. Plaintiffs seeking to recover for loss of enjoyment of life are equally "entitled to submit expert testimony to help guide the jury in reaching an appropriate damages award." *See Sherrod*, *supra*, 827 F.2d at 205.

While perhaps imperfect, the willingness-to-pay methodology is the leading theory employed by economists to perform this calculation. The jury should not be denied the benefit of this useful testimony – testimony which is the result of decades of economic analysis and research on valuing human life. Experian's objections to Dr. Smith's testimony go to the weight to be given and not its admissibility.

11

Finally, a simple finding that Dr. Smith's testimony is admissible does not equate to a jury accepting his testimony. Any weaknesses in an expert's testimony can be uncovered through traditional methods of vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof. *See Daubert*, *supra*, 509 U.S. at 596.

Thus, for all the foregoing reasons, Plaintiff respectfully requests Defendants' Motion in Limine be DENIED, and that Dr. Stan Smith be permitted to testify at trial.

Respectfully submitted,

  /s/ Sylvia A. Goldsmith
Sylvia A. Goldsmith, Esq. (#0064871)
LAW OFFICE OF SYLVIA A. GOLDSMITH
Gemini Towers
1991 Crocker Road, Suite 600
Westlake, Ohio 44145
Telephone: (440) 934-3025
Facsimile: (440) 934-3026
**SGoldsmithLaw@aol.com**

Dale K. Irwin (Mo. Bar No. 24928)
SLOUGH, CONNEALY, IRWIN
 & MADDEN, LLC
1627 Main Street, Suite 900
Kansas City, Missouri 64108
Telephone: (816) 531-2224
Facsimile: (816) 531-2147
**dirwin@scimlaw.com**

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing is being filed electronically with the United States District Court for the Western District of Missouri, on this 1st day of December 2009. Notice of this filing will be transmitted to counsel of record by operation of the Court's electronic filing system.

/s/ Sylvia A. Goldsmith
Sylvia A. Goldsmith (#0064871)
LAW OFFICE OF SYLVIA A. GOLDSMITH
Attorney for Plaintiff