

# Michael L. Brookshire & Associates

333 12th Street, Suite 3
P.O. Box 1046
Dunbar, West Virginia 25064

Telephone: 744-0781
Telecopier: 744-0795
Area Code: (304)

VIA FACSIMILE

## M E M O R A N D U M

TO: Stan Smith

FROM: Michael L. Brookshire MLB/lsk

SUBJECT: Atlanta NAFE Meeting and Dr. Viscusi's Comments

DATE: May 6, 1992

At the Annual Meeting of the National Association of Forensic Economists in Atlanta in December, 1989 one of the three section meetings was devoted to the loss of enjoyment of life damages. The four panelists presenting papers included Kip Viscusi, Ted Miller, Bill Dickens and Stan Smith. A compendium of these was published in the Fall, 1990 issue of the Journal of Forensic Economics.

In the paper handed out at the meeting, and in his presentation, Viscusi maintained that whole life costs, in the dimension of $5,000,000 should be used as the basis for valuing life. Smith presented loss of enjoyment of life figures netting out lost earnings, amounting to approximately 2.3 million dollars for a statistically average person. Miller and Dickens also made presentations. A general discussion by the panelists followed.

Viscusi maintained that he believed these estimates of the value of life should be used only in product liability cases. When pressed by Smith as to what figures Viscusi would provide to a jury if and when a jury was allowed to award for the value of life in non-product cases, Viscusi replied: "Well then I would provide your figures, Stan."

MLB/lsk

# AFFIDAVIT

This is to certify that I am currently a Vice President of the National Association of Forensic Economists (NAFE) and national co-chair for the next, annual meetings of that group in conjunction with the American Economic Association. The following are facts and opinions related to the proper calculation of lost enjoyment of life (hedonic) damages and the methods used by Professor Stan Smith:

1.) Stan Smith and I outlined the methodology of hedonic calculations in the book Economic/Hedonic Damages: The Practice Book for Plaintiff and Defense Attorneys. (Cincinnati: Anderson, 1990) and in the article "Hedonic Damages and Personal Injury--A Conceptual Approach," Journal of Forensic Economics (December 1989).

2.) While no one has surveyed the 600 or so members of NAFE to determine opinions and methods regarding hedonic calculations, it is my personal knowledge that many colleagues in NAFE, including other national officers of this group, use the general methodology developed by Stan Smith and me.

3.) I have testified using this methodology on several occasions during the last few years. These testimonies have been in federal and/or state courts of West Virginia, Ohio, Tennessee, and South Carolina.

[signature] May 16, 1991
Michael L. Brookshire, Ph.D. — Date
Professor of Economics
University of West Virginia

Sworn and subscribed by Michael L. Brookshire before me a Notary Public in and for the County of Kanawha, State of West Virginia, this 16th day of May, 1991.

Naomi Mallory
Notary Public

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
NAOMI MALLORY
CHARLESTON NATIONAL BANK
P. O. BOX 1113
CHARLESTON, WV 25324
My Commission Expires April 23, 2000

# MEMORANDUM

**TO:** File

**FROM:** Stan V. Smith

**RE:** Attached Deposition Testimony by Dr. Kip Viscusi

Dr. Viscusi, now a professor at Harvard, is one of the most prolific researchers on the value of life.

He has testified for both plaintiff and defense firms regarding the value of life. In this depositon, for the plaintiffs, on page 15 he states the the victims total value of life is $5.06 million. On the bottom of page 44 he states unequivocally that "No question, these are correct numbers."

There is no other economist who has a better reputation regarding value of life research.

Page 53 -

Stan V. Smith
Corporate Financial Group Ltd
1165 N. Clark Street, Ste 650
Chicago, IL 60610
PLEASE COPY / RETURN ORIGINAL

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS

STATE OF MISSOURI

BRENDA L. HUNCOVSKY, et al., )
Plaintiffs, ) CAUSE NO. 568478
vs. ) Team B
THE GATES RUBBER COMPANY, et al., )
Defendants. )

**DEPOSITION OF WITNESS WILLIAM KIP VISCUSI**
**Taken on behalf of the Defendant Gates Rubber**

July 24, 1990

*LAROSE REPORTING SERVICE*
Certified Shorthand Reporters

P.O. Box 21628
St. Louis, MO 63109
(314) 351-9590

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS

STATE OF MISSOURI

BRENDA L. HUNCOVSKY, et al., )
)
Plaintiffs, )
vs. ) NO. 568478
) Team B
THE GATES RUBBER COMPANY, )
et al., )
)
Defendants. )

Telephone deposition of William Kip Viscusi, taken on behalf of the Defendant Gates Rubber Company, at the law offices of The Hullverson Law Firm, 1010 Market, in the City of St. Louis, State of Missouri, on the 24th day of July, 1990, before Sandra K. LaRose, Certified Shorthand Reporter and Notary Public.

Appearances of Counsel:

For The Plaintiff:

The Hullverson Law Firm
1010 Market Street, Suite 1550
St. Louis, MO 63101
By: Richard R. Kordenbrock, Esq.

For The Defendant Gates Rubber Co.:

Evans & Dixon
1125 Grand, Suite 1710
Kansas City, MO 64106
By: Robert P. Numrich, Esq.

For The Defendant Lester Engineering:

Brown, James & Rabbitt
705 Olive Street
St. Louis, MO 63101
By: Michael J. Lach, Esq.

- - - - - - -

WILLIAM KIP VISCUSI,

of lawful age, having been first duly sworn to testify the truth, the whole truth, and nothing but the truth, deposes and says on behalf of the Defendant Gates Rubber Company, as follows:

DIRECT EXAMINATION

QUESTIONS BY MR. NUMRICH:

Q Would you state your name, please.

A I go by W. Kip Viscusi. The W stands for William.

Q And what is your present residence address?

A 100 Spicewood Place, Chapel Hill, North Carolina.

Q How long have you lived at that address?

A About a year and a half.

Q Have you ever lived in the St. Louis area?

A Chicago is all of the St. Louis area, that's the closest I have been.

Q Have you ever worked in the St. Louis area, other than being hired as a consultant to testify?

A I have done work for Anheuser-Busch, but that did not involve testimony.

Q Was that -- what type of work did that involve, Professor?

A That was advising them about hazard warning

labels for alcoholic beverages.

Q Outside of that employment by Anheuser-Busch, have you been employed otherwise in the St. Louis area?

A Other than testifying in court cases and preparing analogies for court cases, no.

Q What is your title?

A Professor of Economics.

Q Where?

A At Duke University.

Q That's located in Durham, North Carolina?

A Correct.

Q Is that a full-time position?

A Yes, it is.

Q Approximately how many hours a week do you spend as a professor of economics at Duke University?

A Hard to count, since this is what I do. Essentially, both weekends, nights and whatever, I'm generally in my office, excluding lunch hours and so on, I'll be in my office forty-five hours a week, and I also work at home and in the evenings, so it's more than a forty hour a week job, I'm not paid by the hour.

Q Do you teach at Duke University?

Huncovsky?

A I don't recall the exact date, I assume that it was sometime before that first letter --

Q Do you recall --

A -- I received.

Q Do you recall how long before that first letter?

A No, I do not.

Q That first letter, as I understand it, would be April 9th of 1990, is that right?

A That's correct. And the letter refers to a recent telephone conversation, so, I assume it was shortly before that I was contacted.

Q Nothing else in your file to indicate the date?

A That's correct. So, I don't have any phone notes from the original conversation that I kept or even made. I don't think I was given much of a description.

Q What were you asked to do with regard to the information provided to you on Jason Huncovsky?

A I was asked to calculate the value of his economic loss, including the economic value of pain and suffering.

Q Anything else?

have been made on your updated bibliography, at this time, so we can talk about them, if there is anything of significance on that update.

A All right.

Q I'll mark the curriculum vitae and the bibliography dated 2-14-89 as Exhibit No. 2.

A All right.

(WHEREUPON, THE REPORTER DULY MARKED FOR IDENTIFICATION DEFENDANT'S EXHIBIT NOS. 1 AND 2.)

Q (By Mr. Numrich) I believe you just testified that the calculation for Jason Huncovsky's loss due to pain and suffering was not included on Exhibit 1, is that right?

A That's correct.

Q Do you have a separate calculation of that number?

A I have a calculation, as well as a general methodology the jury might use to think about this issue.

Q First of all, what is that number?

A I have several numbers, depending on what we are trying to capture. I have reference points, specific estimates of pain and suffering. Do you want me to go through the whole set?

Q I would appreciate it if you would.

A Well, the first estimate is the estimated value of life, and this includes not only pain and suffering, but a lost value of enjoyment of life as well as loss of earnings, this figure would assume all the losses. This number is 5.06 million dollars. The second statistic I have is a reference point value just to get at the pain and suffering component, and although I don't know the exact pain and suffering estimate for fatal burn injury, I have a methodology I developed in the use of the Environmental Protection Agency, an estimate of the value to individuals of the pain and suffering and non-monetary losses due to chronic bronchitis, which I think most people would agree is less painful than being burned to death, that loss is four hundred and fifty-seven thousand dollars. The third reference point I have developed is an estimate of the actual pain and suffering amounts that people receive for fatal burn injuries, and I have calculated this using a sample of over ten thousand product liability claims, and this includes claims settled out of court as well as court verdicts, so, it tends to be downward biased, my estimate of pain and suffering using these data was a number of a hundred

Q Move on to number one, your estimated value of life or lost value of enjoyment of life, and you gave me a figure of 5.06 million dollars, is that correct?

A That's right.

Q Can you give me the basis of that calculation?

A Yes, I can.

Q Would you please do so?

A Okay. I have obtained estimates of the value of life in a number of studies and the most recent estimates of the value of life using the newly developed data on death risks put together by the National Institute for Occupational Safety and Health indicate that the value that workers receive reaching statistical death is 5.2 million dollars. That's their rate of trade-off, in terms of how much compensation we have to provide workers to accept a risk of death. I have adjusted this 5.2 million dollars to reflect the difference in the earnings of the workers in my sample which was seven dollars and seventy-one cents per hour as opposed to the earning level of Mr. Huncovsky of six dollars and fifty cents per hour. And using my estimates from the article in the American Economic Review that I





referred to, it's article number eighty-seven, I have adjusted the value of life numbers to reflect the differing income levels and I come up with a figure of 5.06 million dollars.

Q The methodology for the OSHA article you have just identified -- by the way, is that article in your bibliography, or is that an article that wa[s] published by someone other than you?

A That's published in actually two places, it's our book, Compensation Mechanisms for Job Risks, published by Princeton University Press.

Q That is number what?

A On mine, Compensation Mechanisms for Job Risks is number seven. It's the book with Michael Moore, Michael J. Moore.

Q Okay.

A So, it's included in that book, as are a number of our other studies. And it's also published in the Journal of Policy Analysis and Management in 1988. And on my vita, it's number sixty-four, and it may be number sixty-one on your[s].

Q Does that article which is included in you[r] books set out the methodology of how that number wa[s] arrived at?

A Yes, it does. Although, it does build on

my earlier work, but, yes, it does.

Q Then the only additional calculation you made was to reduce that by a computation of the difference between the seven-seventy-one and the actual six-fifty an hour that Mr. Huncovsky was making?

A Right. And this is -- well, these numbers are being prepared as examples of how I would approach the issue. This is not a -- what we are dealing with here is not a formal report, this is just a letter to Mr. Kordenbrock. So, when you think of these numbers, there are several numbers in the literature, so, even in that article, we have a value of life range, so, there is six million dollar numbers, seven million dollar numbers. This is this range of estimates in the value of life so that I'm talking about this as being an estimate of the value of life, in terms of my best estimate as opposed to being a unique number.

Q Again, is that the number that you would theoretically have to pay somebody?

A To die?

Q Yes.

A No. This is the number you -- if you had ten thousand people and you told them one of them

was going to die, this is the total amount of compensation you would have to pay this group to incur one death among them. This type of process didn't incur explicitly, nobody goes around with auctions such as this, but we have implicit contracts with this. In the context of hazardous jobs, one chance in ten thousand that a typical blue collar worker will be killed on his job. And to get these workers to face the risk, on the average, we have to pay them five hundred dollars more. So, that's where the numbers come from.

Q You multiply the five hundred by the ten thousand to get the five million?

A In my story I told you, yes. In the paper, we do it a little differently. That's essentially the whole idea behind the calculation.

Q And that methodology is set out in that article which is contained in your book, in the OSHA article?

A I would read my Risk by Choice book to understand the methodology.

Q Is there anything else about the reference point number one, the lost value of enjoyment of life that we haven't talked about?

A Well, the one thing is that this number

provides an estimate also of the appropriate deterrence value that a court would have to set in order to establish an appropriate incentive for a firm to avoid exposing its workers to the risk of injury, so that if the court were wondering what value do we have to award in terms of compensation, to send the correct economic signals to the firm that they should improve safety, this number is exactly the answer.

Q When you say this is a number the court should use, do you know any court that has utilized this formula?

A This is the number that any social institution could use. It doesn't have to be the courts, it could be worker's compensation, could be a government agency, anybody wanting to establish incentives for safety, correct incentives for safety, these are the numbers. Institutions have used these, these numbers are used throughout the Federal goverment, they are used by the Office of Management and Budget, by OSHA, by EPA, by the Consumer Product Safety Commission. They are the bases that the government uses in determining how to set the stringency of risk in the context of establishing incentives for safety. No question.

these are correct numbers.

Q Whether or not they are the correct numbers, the numbers that are used, I wouldn't characterize them as correct, that's your characterization, these are the numbers that are used by the Federal goverment?

A They are the numbers used by the Federal government.

Q Anything else with regard to that first reference point?

A Not that I can think of.

Q Professor, just for a matter of housecleaning --

MR. NUMRICH: Here, Rick, when you receive the updated CV of Professor Viscusi, why don't we attach that to Exhibit No. 2 as the total exhibit.

MR. KORDENBROCK: That's fine.

MR. NUMRICH: Because I have written -- I didn't have some of the numbers, I have written them on this exhibit, I rather have the numbers as he has referred to them in his testimony.

MR. KORDENBROCK: Okay.

Q (By Mr. Numrich) Did you hear that, Professor?

A Yes, I did.

A More or less. I know I have testified in court at least several times. This covers a long period of time, we are looking at activity from '85 through '90. And eventually, all these activities, they don't last that long, it's a couple of hours, they become a blur, so, I don't keep an exact tally.

Q I'm asking you for your best judgment, at this point in time?

A Okay.

Q You testified in court maybe five times and by deposition maybe ten times for the Hullverson Law Firm, is that right?

A I would say those are probably floors rather than ceilings.

Q There could be more, but that's your best estimate, at this point in time?

A That's the general vicinity, ten, fifteen, maybe, for depositions.

Q Do you advertise your services?

A I have never advertised.

Q And you don't know the names of the other law firms in St. Louis for whom you have worked on the plaintiff's side?

A Oh, one of them just came -- Schlapprizzi law firm.